IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | NO. 20-72 |
| EDWARD BURGESS : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                     **NOVEMBER 28 2022**

Presently before the Court is Defendant Edward Burgess' Motion to Suppress Physical Evidence. (ECF No. 31.) A suppression hearing was held on November 10, 2022. Because the Court finds that both reasonable suspicion and probable cause existed to justify the seizure of Defendant, Defendant's Motion will be denied.

**I.      FINDINGS OF FACT**

In the spring of 2018, the Pennsylvania State Police Bureau of Liquor Control Enforcement began an investigation into the Glass Door Lounge ("the Lounge"), located at 5202 Woodland Ave, Philadelphia, PA, for selling liquor and tobacco without a license. (Nov. 10, 2022 Hr'g Tr. at 6:13-17; 9:1-9.) The lead investigator on this investigation was Officer Chandrea Pigatt. (*Id*. at 40:10-11; 60:18-19.) On March 7, 2019, Officer Pigatt conducted surveillance outside the Lounge and observed individuals entering and exiting the facility. (*Id*. at 9:1-5, 10-14.) Officer Pigatt returned to the Lounge on May 3, 2019, at approximately 10:20 p.m., and it was closed, so she left. (*Id*. at 9:15-20.) On May 19, 2019, Officer Pigatt returned a third time at 3:00 a.m. and observed patrons entering and exiting the facility, indicating that the Lounge was operating after typical bar hours. (*Id*. at 9:12-25, 10:1-8.) On June 1, 2019, Officer Pigatt returned to the Lounge at 11:55 p.m. with two other officers, Officer Strand and Officer

1

Finney, all acting undercover. (*Id*. at 10:13-19; 52:2-9.) When the officers arrived at the Lounge, Defendant Edward Burgess was standing right outside the front door of the Lounge. (*Id*. at 10:22-25; 52:10-18, 53:1-2). The undercover officers asked him if the Lounge was open and Defendant indicated that it was and told them to go inside. (*Id*. at 11:1-4; 52:3-7, 20-23.)

The officers then entered the Lounge and proceeded to the second floor, which was nearly empty, and sat in the second-to-last booth. (*Id*. at 11:18-20; 13:21-2.) They were then approached by another employee, co-owner Wayland Laws, who offered them a hookah, which they accepted. (*Id*. at 13:21-25, 14:1-14; 54:1-7.) They also bought three drink tickets—raffle tickets purchased with cash that can be exchanged for drinks at the bar—from Mr. Laws's wife, Tyreen Whittaker. (*Id*. at 14:7-10, 18-23; 31:13-19; 54:1-7.) Officer Pigatt ordered three pineapple and rum drinks from the bar with the tickets, watched the bartenders pour alcohol into the drinks, and the officers consumed the drinks, confirming by taste that they contained alcohol.[1] (*Id*. at 15:1-23; 54:12-14; 55:16-23.) The officers stayed at the Lounge for approximately one hour and then left, at which point there were only four other patrons in the establishment. (*Id*. at 16:9-17; 55:24-25, 56:1-2.)

Following the officers' June 1, 2019 visit to the Lounge, Officer Pigatt sent a certification request to the Pennsylvania Liquor Control Board to determine whether the Lounge had a valid liquor license, which it did not. (*Id*. at 16:21-25, 17:1-9; Gov't Ex. 2.) Officer Pigatt also researched the Lounge on social media. (*Id*. at 13:24-25; 14:1-5; 24:10-12; 38:8-9; 39:2-7; 53:16-19.) During her social media search, she identified two individuals who self-identified as co-owners of the Lounge: Wayland Laws and Edward Burgess, the Defendant. (*Id*.)

---

[1] Undercover officers investigating unlicensed establishments are permitted to drink alcohol while working, in order to preserve their undercover status and safety. (Tr. at 15:24-25, 16:1-6; 58:7-13.)

On June 16, 2019, Officers Pigatt, Strand, and Finney returned to the Lounge. (*Id*. at 17:21-23; 56:3-5.) Unlike the previous visit, the Lounge was crowded on this evening, with approximately 45 to 65 patrons. (*Id*. at 19:12-16; 56:18-19.) The lighting in the Lounge was dim, but not so dim as to impair the officers' ability to see. (*Id*. at 19:17-22; 56:25; 57:1-4.) Additionally, on this evening Officer Pigatt had approximately 20 uniformed officers—including officers from Philadelphia Citywide Vice, Philadelphia Police Department, Philadelphia Licenses and Inspection, and Pennsylvania State Police Bureau of Liquor Control Enforcement—waiting outside the Lounge to conduct a raid. (*Id*. at 22:4-10; 41:12-14.) The plan was for Officer Pigatt to communicate descriptions of the individuals engaged in the illegal sale of alcohol and tobacco at the Lounge with the uniformed officers via text message. (*Id*. at 21:25, 22:1-18.) The uniformed officers would later use these descriptions during the raid to identify the individuals to arrest. (*Id*.)

When the officers entered the establishment, they were greeted by the same female employee who provided them with drink tickets during their June 1st visit. (*Id*. at 18:1-5; 56:8-12.) Officer Pigatt bought six drink tickets from her, and the officers sat in the same booth as their previous visit, the second-to-last. (*Id*. at 18:1-8; 56:8-14.) Officer Strand then approached the bar and ordered a hookah and three drinks, orange juice with vodka. (*Id*. at 18:9-14; 56:16-17.) Officers Finney and Pigatt both consumed one of these drinks and confirmed they contained alcohol. (*Id*. at 18:15-20; 56:16-17; 57:7-13.) Officer Finney later ordered two more drinks from the bar, also vodka and orange juice, and observed the bartender pouring vodka into the drinks. (*Id*. at 57:16-22.) Officers Pigatt and Finney partially consumed these drinks as well and confirmed that they contained alcohol. (*Id*. at 19:1-7; 57:23-25; 58:1-6.) Neither Officer Pigatt

3

nor Officer Finney was impaired after consuming these drinks. (*Id*. at 19:8-11; 57:14-15; 58:5-6.)

During their time at the Lounge on June 19, Officers Pigatt and Finney observed Defendant around the Lounge acting in, what they observed to be, a managerial role. (*Id*. at 20:5-17; 21:6-10; 58:14-25; 59:1-4, 15-22; 60:2-10; 71:7-19.) Specifically, the officers observed Defendant walking behind the bar and talking with bartenders on several occasions, walking in and out of staff doors, including one from which employees were pulling hookahs, and helping the staff, including getting ice for the bartenders. (*Id*.) From these observations, the officers concluded that Defendant was a manager at the Lounge. (*Id*. at 24:10-13; 37:9-16, 21-23; 60:7-10.)

While the officers were undercover inside the Lounge, Officer Pigatt sent text messages to the uniformed officers waiting outside describing the conditions inside the Lounge and identifying the individuals who should be arrested as part of the raid by describing what they were wearing and their physical descriptions.[2] (*Id*. at 22:11-21.) Officer Pigatt identified anyone they handed money or drink tickets to and identified Defendant as a manager based upon their observations and his identification as a co-owner of the bar on the Lounge's social media page.

---

[2] The text messages exchanged between Officer Pigatt and the uniformed officers waiting to conduct the raid regarding the individuals who should be targeted for arrest were deleted. (Tr. at 22:22-25; 23:1-2; 61:1-17; 69:11-25.) The officers testified that preserving these kinds of text messages presents a safety concern for undercover officers, as employees at illegal speakeasys are on the lookout for police and are watching over patrons' shoulders. (*Id*. at 22:22-25; 23:1-2; 41:22-25; 42:1-2; 51:13-23; 61:1-17.) This safety concern is further exacerbated by the fact that undercover officers do not carry guns, badges, police radios, or wear wires when they conduct undercover investigations, and they do not have backup. (*Id*. at 7:24-25; 8:1-25; 51:1-25; 52:1; 61:1-17.) While the officers testified that they deleted the text messages at different points, Officer Pigatt in the moment as she was sending them and Officer Finney later, after the raid was concluded, their answers are not incompatible. (*Id*. at 22:22-25; 23:1-2; 69:14-25.) It is plausible that the officers could have deleted the texts at different times. We found both officers' testimony credible and therefore take their testimony regarding the deleted text messages as true.

4

(*Id*. at 23:15-25, 24:1-12; 59:23-25, 60:1; 60:11-13.)  Defendant was identified to the raid team as a black, non-Hispanic male, approximately 5 feet and 8 inches tall and 135 pounds, and wearing a black baseball cap, a black jacket with multicolored print, and black sneakers.  (*Id*. at 23:21-25, 24:1-7.)

Later in the night, Officer Pigatt signaled for the raid team to enter the Lounge.  (*Id*. at 24:15-17.)  Once they entered, they announced themselves and began securing the targeted individuals.  (*Id*.)  The patrons of the Lounge bar—including the undercover officers—began moving toward the exit of the attempting to leave, but the uniformed officers told the patrons that they were not free to leave.  (*Id*. at 24:17-24.)  While part of the crowd of patrons, Officers Pigatt and Finney were standing directly behind Defendant, approximately one arms' length away or less.  (*Id*. at 25:17-20; 26:1-3.)  While Defendant was immediately in front of them, two uniformed officers approached Defendant and took each of his arms in order to pull him forward, but he resisted and attempted to pull his arms away.  (*Id*. at 26:13-17; 27:10-11.)  Defendant then reached into the right side of his waistband, pulled out a firearm, and tossed it behind him onto the ground.  (*Id*. at 26:18-21.)  As it fell, the firearm hit Officer Finney's leg, then Officer Pigatt's leg.  (*Id*. at 27:11-14, 22-25.)  When it landed on the ground, Officer Pigatt motioned to pick it up, but Officer Finney told her not to touch it, and one of the uniformed officers came over and recovered the firearm.  (*Id*. at 28:9-19.)  The firearm was ultimately placed on the property receipt for the raid.  (*Id*. at 28:20-22.)  Once the patrons were allowed to leave, the undercover officers left and concluded their visit.  (*Id*. at 28:23-25, 29:1.)

Defendant filed the instant Motion to Suppress on August 23, 2022. (Def.'s Mot., ECF No. 31.) The Government filed a Response in Opposition on September 6, 2022. (Gov't's Resp., ECF No. 34.)  A suppression hearing was held on November 10, 2022.  (See Min. Entry, ECF

No. 40.) Over the course of the hearing, the Government presented several documentary exhibits that were admitted into evidence. The Government also presented testimony from Officer Pigatt and Officer Finney. Defendant cross-examined both officers. The Court found the testimony of Officers Pigatt and Finney to be credible.

**II.   CONCLUSIONS OF LAW**

In his Motion, Defendant seeks to suppress the firearm that Defendant threw onto the ground from his waistband during a raid of the Glass Door Lounge, an illegal speakeasy. Defendant argues that the police lacked both probable cause and reasonable suspicion that he was engaged in criminal activity in order to justify his seizure and, therefore, that it was unlawful. Accordingly, he asserts that the firearm he abandoned during the unlawful seizure must be suppressed under the fruit of the poisonous tree doctrine. The Government argues that seizure was lawful because the officers had both reasonable suspicion and probable cause to arrest Defendant after undercover officers observed him engaged in criminal activity. Therefore, the Government asserts, the firearm need not be suppressed. We agree.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; see also *United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *Katz v. United States*, 389 U.S. 347, 356-57 (1967). However, if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender. *Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001). Additionally, an officer may "seize a person consistent with the Fourth Amendment if they have reasonable, articulable, and individualized suspicion that a suspect is engaged in criminal activity." *United States v. Lowe*,

791 F.3d 424, 434 (3d Cir. 2015) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1 (1968)).  A seizure occurs when there is "a laying on of hands or application of physical force to restrain movement," even when the suspect does not yield to that force.  *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006).  Under the fruit of the poisonous tree doctrine, "evidence gathered as a result of an unlawful search or seizure must be suppressed at trial.  When the abandonment of property is precipitated by an unlawful seizure, that property . . . must be excluded."  *United States v. Coggins*, 986 F.2d 651 (3d Cir. 1993).

Importantly, not all seizures are arrests; it is well-established that investigative seizures only require reasonable suspicion, not probable cause, in order to be compliant with the Fourth Amendment.  *See Lowe*, 791 F.3d at 434.  The Supreme Court has not established a bright-line rule to distinguish a warrantless arrest from an investigatory stop.  *United States v. Torres*, 961 F.3d 618, 622 (3d Cir. 2020).  However, when determining whether a seizure constitutes a stop or an arrest, the Committee on Model Civil Jury Instructions for the Third Circuit recommends considering a non-exclusive range of factors, including whether the defendants diligently pursued the investigation or caused undue delay, whether handcuffs were used, whether the seized individual was moved to a police facility, and whether defendants stated the suspect was under arrest.  *See* 3d Cir. Model Jury Charge §§ 4.12.1-2.  Ultimately, the "reasonableness of the intrusion is the touchstone of our analysis."  *Torres*, 961 F.3d at 622 (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995)).  "The Supreme Court has emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  *Id*. (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985).).

7

First, we find that the officers were conducting an investigative seizure of Defendant, not an arrest, when he abandoned the firearm. At the time he abandoned the firearm, the uniformed officers had just grabbed each of Defendants' arms in order to pull him forward from the crowd. This was clearly a "laying on of hands . . . to restrain [his] movement" and, therefore, a seizure. *Brown*, 448 F.3d at 245. However, it was not yet an arrest. There were no handcuffs used, the officers never stated that Defendant was under arrest, nor was he moved more than a few inches from where he was standing. It was an extremely brief seizure between the moment the officers grabbed his arms to when he discarded the firearm. In fact, the officers had not even secured Defendant at that point, as he was resisting them. For these reasons, the reasonable suspicion standard applies to determine the lawfulness of the seizure.

Based on the totality of the circumstances, we conclude that the officers had reasonable suspicion to seize Defendant. The officers clearly articulated the facts and observations which gave rise to their suspicion of his involvement in criminal activity, and we find the officers' testimony credible. First, the officers knew that the Lounge was an illegal speakeasy—they confirmed that it did not have a liquor license and also confirmed that it was serving alcoholic drinks. Further, during the two visits made by Officers Pigatt, Finney, and Strand to the Lounge, they observed Defendant acting in, what they perceived to be, a managerial role. This included standing at the entrance of the Lounge and telling the officers—acting as patrons—that the Lounge was open and inviting them in, walking in and out of staff doors several times, walking behind the bar and talking to the bartenders, and getting ice for the bar. In addition, the officers had researched the Lounge's social media page, which listed Defendant as a co-owner. Therefore, taking all of this together, it was reasonable for the officers to conclude that

Defendant was, at the very least, an employee of the Lounge and, thus, that he was engaged in criminal activity.

Nevertheless, even if we were to conclude that Defendant's seizure was an arrest rather than an investigative seizure, we also find that the officers had probable cause to arrest him. Probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest." *Id*. Specifically, an arrest was made with probable cause "if at the moment the arrest was made the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Wright v. City of Phila.*, 409 F.3d 595, 596 (3d Cir. 2005). These determinations frequently "have to be made on the spot under pressure and do not require the fine resolution of conflicting evidence." *Williams v. City of York*, 967 F.3d 252, 263 (3d Cir. 2020).

For the same reasons discussed above, we find that the officers had probable cause to believe that Defendant was engaged in the illegal sale of alcohol due to his involvement at the Lounge. Beginning with Officer Pigatt's online research, the Lounge's social media indicated that Defendant was a co-owner. Further, during their visits, the officers observed him working in a managerial role, including entering and exiting staff doors, going behind the bar, and helping other employees. Because the determination of probable cause was made "on the spot under pressure," it did not require the "fine resolution of conflicting evidence" before the officers could arrest him, including determining whether patrons would also be permitted to enter staff areas or would be welcomed behind the bar. From the officers' experience and observations, it was

reasonable for them to conclude that Defendant was a manager or co-owner of the Lounge and, therefore, they had probable cause to arrest him for his involvement in the illegal sale of alcohol.

Because the officers had both probable cause and reasonable suspicion to seize Defendant, the firearm he abandoned need not be suppressed. Defendant's Motion to Suppress Physical Evidence will be denied. An appropriate Order follows.

                                        **BY THE COURT:**

                                        */s/ R. Barclay Surrick*
                                        **R. BARCLAY SURRICK, J.**